## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CAMPION, BARROW & ASSOCIATES, INC., an Illinois Corporation, and MICHAEL CAMPION, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | No. 06-3215 |
| CITY OF SPRINGFIELD, | ) ) ) | |
| Defendant. | ) | |

### OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant City of Springfield's Motion for Summary Judgment (d/e 54) (Motion). For the reasons set forth below, the Motion is allowed.

### STATEMENT OF FACTS

Plaintiff Campion, Barrow & Associates, Inc. (CBA), is an Illinois corporation that provides psychological services. CBA provides services to numerous police departments. Plaintiff Michael A. Campion holds a Ph.D. in psychology and is a licensed clinical psychologist in Illinois, Minnesota,

and Indiana.  He is the CEO and Senior Psychologist for CBA. For fifteen years, Campion and CBA provided psychological services to the City of Springfield, Illinois (City), and its police and fire departments.  The primary service was testing applicants for employment as fire fighters and police officers.   The applicants were required to pass the pre-employment psychological evaluation to be employed.

The City and Campion signed the most recent contract in 2001. Memorandum in Support of Defendants' Motion to Dismiss the Complaint (d/e 17) (Motion to Dismiss Memorandum), Exhibit A, Ordinance No. 521-10-01 (2001 Ordinance) and attached Contractual Services Agreement Between Campion, Barrow and Associates of Illinois, and the City of Springfield Civil Services Commission (Contract).[1]  The Contract recited that it was an agreement between the City and CBA.   The Contract, however, required Campion personally to provide the psychological services. The Contract stated:

Michael A. Campion, Ph.D., shall be the principal consultant

---

[1]The City seems to dispute whether the Contract constituted the written agreement between the parties.  Motion (d/e 54), at 10.  The City already stated that the Contract was the agreement between the parties in the Motion to Dismiss Memorandum cited above.  This constitutes a judicial admission.  The Contract, therefore, was the written agreement between the parties.

with regard to the performance of this Agreement.   All assessments, documentation, reports, and recommendations prepared by CBA hereunder shall represent the professional judgment and expertise of Dr. Campion.

Contract, at 2, § V.

The Contract was for an initial term of one year, renewed automatically on a yearly basis, provided that either party could terminate the Contract at any time upon thirty days written notice.  Id., at 2, § III. Campion further signed the Contract, "Campion, Barrow and Associates of Illinois, By: Michael A. Campion".  Underneath his signature were the words, "Michael A. Campion, Ph.D."  Id., at 5.

A municipality in Illinois must enact an ordinance and appropriate funds in order to enter contractual agreements.  65 ILCS 5/8-1-7(a).  The City requires the City Council to pass a separate ordinance and appropriation for any agreement that exceeds $15,000.00.  Springfield Municipal Code §§ 31.05, 31.11, & 38.44.  The City Council consists of ten Aldermen and the Mayor.  The City Council enacted the 2001 Ordinance to approve the Contract and appropriate funds on October 2, 2001.  The 2001 Ordinance recited that the previous agreement between the parties authorized payment of fees up to $21,000.00.   The 2001 Ordinance

authorized the City to pay up to $36,000.00 for psychological services.

On February 18, 2003, the City enacted Ordinance 97-02-03 (2003 Ordinance) approving another extension of the Contract between the parties.  Motion, Exhibit 18.  The 2003 Ordinance authorized paying an additional $38,000.00 for psychological services.   The 2003 Ordinance recited that the City agreed to pay $375.00 for each pre-employment psychological evaluation.

Timothy Davlin became Mayor of Springfield on April 1, 2003. Davlin believed that the pre-employment psychological evaluations were unnecessary.  Davlin knew that Sanagamon County, Illinois, did not use psychological pre-employment evaluations.  He believed the City could save money by getting rid of these evaluations.  Motion, Exhibit 11, Deposition of Timothy Davlin (Davlin Deposition), at 11-12.

Shortly after becoming Mayor, Davlin reviewed some of the psychological pre-employment evaluation reports produced by Campion. The results section of each report was redacted so that Davlin could not tell whether the candidate passed the pre-employment evaluation.  Davlin then read the reports and tried to guess whether the candidate passed or failed. Davlin guessed wrong every time.   This confirmed his belief that the

examinations had no real value.  Id., at 11.

Davlin raised the issue with the City's Corporation Counsel Jenifer Johnson.  Frank Martinez, a staff attorney in Johnson's office, researched the matter.   Martinez produced a Memorandum dated July 1, 2003, addressed to Johnson and the City's Director of the Department of Human Relations, Larry Selinger.  Motion, Exhibit 24, Memorandum dated July 1, 2003.  Martinez cautioned against eliminating the psychological screening of applicants:

> The psychological evaluation of police officers and firefighters play a significant role in ensuring that candidates selected for these positions do not pose a threat to public safety from a psychological point of view.   Abolishing the psychological examination itself would create negligent hiring liability if the City could have screened out a candidate with psychological difficulties.

Id.  Martinez also praised CBA for the work that it was doing for the City, "Campion, Barrow and Associates have done an excellent job for the City from the information I have reviewed while advising the Civil Service Commission." Id.

Johnson agreed with Martinez that the City should continue to use psychological screening as part of its pre-employment screening for firefighters and police officers.  Motion, Exhibit 12, Deposition of Jenifer

Johnson (Johnson Deposition), at 13, 58.

In 2003, nine unsuccessful applicants for City firefighter positions challenged the City's decision not to hire them, and ultimately filed an action for judicial review of the adverse decision of the City's Civil Service Commission. The details of this proceeding are not clear from the record, except that the complainants claimed that they were not hired because each failed a psychological evaluation. They claimed that the psychological evaluation process was unfair. The City's Civil Service Commission prevailed in these proceedings. Johnson Deposition, at 21.

The nine complainants asked City Alderman Frank Edwards to review the psychological evaluations. Edwards had been the Chief of the City's Fire Department before retiring and then being elected to the position of Alderman. Edwards reviewed the psychological evaluations of the nine applicants and those of some successful applicants. He was very critical of the evaluations. He opined that the evaluations had no consistency. Motion, Exhibit 6, Deposition of Frank Edwards, at 21. Edwards agreed largely with Davlin's opinion that psychological pre-employment evaluations were of no value. Id., at 14. Edwards, however, did not see any bias in the evaluations. Id., at 22.

On August 24, 2004, a weekly newspaper in Springfield, Illinois, called the <u>Illinois Times</u>, ran a column written by a reporter named Dusty Rhodes entitled, "Partial Disclosure." <u>Motion</u>, Exhibit 15, <u>"Partial Disclosure" Column posted to Illinois Times website August 19, 2004 (Column)</u>. The Column criticized Campion for not including in his curriculum vitae the fact that he was on the Board of Directors of a group called the Illinois Family Institute (IFI). The Column stated that the IFI was a non-profit organization "'dedicated to defending marriage, family, and the sanctity of life.'" <u>Partial Disclosure</u>, at 1-2 (quoting IFI website [www.illinoisfamily.org](www.illinoisfamily.org)). The Column stated, "Prolific postings by its executive director, Peter LaBarbera, alert members to any political maneuvers or media stories that might promote gay marriage, 'deviant sex,' abortion, or stem-cell research. Campion and his wife have served on the group's board since 1999." <u>Column</u>, at 2. According to the Column, Campion stated that he did not list his association with IFI on his curriculum vitae because it was irrelevant to his work. The Column quoted Campion as explaining that "'Municipalities hire me because of my qualifications and my expertise, not because of what party I vote for.'" <u>Id.</u>

The Column stated that nine applicants had sued the City in 2003

because they failed the psychological evaluations.  The Column compared the results of two African American applicants, a man and a woman, referred to by the aliases "Jack" and "Jill".  The otherwise well-qualified man did not pass the psychological evaluation, but the otherwise less qualified woman passed.  The Column stated:

> Could the fact that she was married with two children -- Jack was 33, single, and childless -- have made any difference to Campion?  Or could the fact that Jill listed "belief in God" and "family values" as her two greatest personal strengths?  Surely not.  These traits have nothing to do with public safety.

Id.

Alderman Joe Bartolomucci stated that the Column created a significant political problem for the Davlin administration.  Motion, Exhibit 3, Deposition of Joe Bartolomucci (Bartolomucci Deposition), at 34.  He agreed that the situation was a little bit of a political firestorm.  Bartolomucci Deposition, at 35.  Bartolomucci stated: "Well, those who are in power want to stay there, and if they're going to smooth out the bumps in the road, this was obviously a problem, and the administration had to do something about it."  Id.

After reading the Column, City Alderman Frank McNeil went to Davlin and told him: "Hey, this guy's got to go.  He's out of touch with the

mainstream.  He has an absolute right to his conservative views, and we have an absolute right to change reviewers." <u>Motion</u>, Exhibit 1, <u>Deposition of Frank McNeil (McNeil Deposition)</u>, at 34.[2]  Most other Aldermen, however, did not recall seeing the Column before being deposed in this case. Davlin did not recall reading the Column and did not recall McNeil's request to get rid of Campion.  <u>Davlin Deposition</u>, at 17.

On December 21, 2004, the City enacted Ordinance 711-12-04 (2004 Ordinance), extending the Contract and authorizing the payment of an additional $7,400.00, for a total not to exceed $45,400.00 in fees for psychological services.  <u>Motion</u>, Exhibit 19, <u>Ordinance 711-12-04</u>.  The 2004 Ordinance authorized payment of $375.00 per psychological evaluation.

By January 2005, however, the City was looking for a new psychologist.  On January 27, 2005, City Police Chief Don Kliment sent an email to Johnson with the subject line, "Info you requested".  The body of the email stated:

---

[2]McNeil's statement to Davlin was quoted in a subsequent <u>Illinois Times</u> column entitled "Last Straw" published in May 2005.  <u>Motion</u>, Exhibit 16, <u>"Last Straw" column posted to Illinois Times website on May 19, 2005</u>.  Edwards' opinions about the evaluations of the nine unsuccessful applicants was also quoted in this column.  The "Last Straw" column was published after the relevant events took place and so had no impact on the City's actions.

> Here's a firm........Colarelli, Meyer & Associates, 7751
> Carondalet Ave., St. Louis, Mo. (314) 721-1860.  Chief
> Bradford from Glen Carbon P.D. states they evaluated in 5
> categories.  He did not remember the cost.

<u>Response to Defendant's Partial Summary Judgment (d/e 56) (Response)</u>,

Exhibit 5, <u>Email dated January 27, 2005.</u>  Johnson then forwarded the email

to Kendra Davis, the Assistant Director of the City's Department of Human

Resources.  Johnson said, "Here is info the Chief got re: a St. Louis firm that

does psychs.  Do you mind contacting them?"  <u>Id.</u>

On March 16, 2005, Davis received an email from a different

psychologist, Paul Detrick, Ph.D., regarding psychological evaluations.

Detrick attached his resume and a sample report.  He stated, "The fee for

pre-employment evaluations is $175/applicant, $350 for fitness for duty

evals.  Call if you have other questions."  <u>Response</u>, Exhibit 6, <u>email dated</u>

<u>March 16, 2005</u>.  Like Campion, Detrick also had extensive experience

conducting pre-employment psychological evaluations for police and fire

departments.  <u>Motion</u>, Exhibit 14, <u>Deposition of Paul Detrick</u>, at 14-17.

Davis forwarded the information to Johnson.  In the forwarding email,

Davis said, in part:

> Also, after looking at Campion's proposal on cost they have a
> pre-employment for $175 and a post-employment evaluation for

$375.  I believe he considers these tests post employment since we pay $375.

My bubble is burst a little, but it would still be a $25 savings per candidate!

Id. Johnson responded, "This sounds great.  I told TD and he is excited too.

Will you need a contract and ordinance?"  Id.

City officials offered differing explanations concerning why the City was looking for a new psychologist.  Johnson could not identify who decided to look for a new psychologist.  She characterized the matter as something that evolved.   She stated that her primary goal was to mollify Mayor Davlin's dissatisfaction with psychological testing in general by changing the company providing the services.  E.g., Johnson Deposition, at 17-18.

Davis said that the impetus for the idea to look for a new psychologist came from the Civil Service Commission because the Commission was concerned with the large number of applicants who were otherwise qualified, but failed the psychological evaluations.  Response, Exhibit 1, Deposition of Kendra Davis (Davis Deposition), at 10-11, 29, 38.  Her boss, Human Resources Director Larry Selinger, agreed that the Civil Service Commission probably initiated the steps to change psychologists. Response Supplemental Exhibit (d/e 57), Deposition of Larry Selinger, at 25.  Selinger, however,

11

later stated in his deposition that he did not really know who initiated the search for a new psychologist. Id., at 41. Johnson said that the Civil Service Commission had nothing to do with hiring or firing psychologists. Johnson Deposition, at 42.

Davlin said that the City changed psychologists to save money. Davlin said that the City sent out requests for proposals and received proposals that provided significant savings over the amount Plaintiffs charged. Davlin Deposition, at 23-24. Later in his deposition, Davlin said that no formal requests for proposals were used. Id., at 62.

On May 17, 2005, the City Counsel passed Ordinance 344-05-05 (2005 Ordinance) on an emergency basis to execute a contract with Detrick to provide services. Emergency passage eliminated the need for two readings of a proposal at two separate Council meetings, but required a super majority of eight votes to pass. Johnson Deposition, at 47-48. All the Council members at the meeting voted for the 2005 Ordinance, including Davlin. Motion, Exhibit 9, Deposition of Irv Smith (Smith Deposition), at 44.[3]

---

[3]Smith states that the vote was 10-0 because Alderman Frank Kunz was absent from the meeting. Smith Deposition, at 44. Kunz, however, stated in his deposition that he voted for the 2005 Ordinance. Motion, Exhibit 7, Deposition of Frank Kunz

Most of the Aldermen did not know why the City was changing psychologists. Most said that the Mayor had the authority to choose the particular psychologist to provide pre-employment evaluations; thus, if the Mayor or his staff recommended a change, the Aldermen relied on those recommendations and approved the requested change. <u>Motion</u>, Exhibit 2, <u>Deposition of Judy Yeager (Yeager Deposition)</u>, at 30-31, Exhibit 4, <u>Deposition of Bruce Strom (Strom Deposition)</u>, at 16, 23, Exhibit 5, <u>Deposition of Mark Mahoney (Mahoney Deposition)</u>, at 22-23, <u>Kunz Deposition</u>, at 10-14, and Exhibit 8, <u>Deposition of Chuck Redpath (Redpath Deposition)</u>, at 9, 29, 41.

Other aldermen, however, stated that McNeil's opposition to Campion's protected activity was part of the motivation for changing psychologists. McNeil told Davlin to get rid of Campion because his views were out of the mainstream. Alderman Bartolomucci stated he believed that the administration changed psychologists to address the political problem caused by the Column. <u>Bartolomucci Deposition</u>, at 43. Alderman Frank Edwards opined in his deposition that the City switched to Detrick because

---

<u>(Kunz Deposition)</u>, at 10. The discrepancy is not material to the decision in the Opinion.

he and McNeil complained about Plaintiff's work:

> Q.    Did you think that Dr. Campion's -- why do you think
>       that Dr. Campion's contract was not renewed?
>
> A.    I don't know, probably because you had two aldermen, me
>       being one of them and the other Frank McNeil making his
>       statements.

<u>Edwards Deposition</u>, at 39.  Edwards stated later in his deposition:

> A.    I think the mayor would probably go and say to the
>       human resources and purchasing agent you know what,
>       this guy's contract's up, we've probably got a couple of
>       aldermen out there shooting their mouths off.  When's his
>       contract up, let's see if we can find somebody else.  I mean
>       I'm giving Tim the benefit of the doubt here, but he's got
>       no dog in this fight.

<u>Id.</u>, at 51.

Alderman Irv Smith opined that McNeil used the emergency passage

procedure to get the change through the City Council:

> Q.    So this was voted for on May 17, 2005?
>
> A.    In emergency.
>
> Q.    Right.
>
> A.    So, you know, it probably did not go through -- now, I'm
>       sure that it went through committee before, but I couldn't
>       bet on it, you know.  But it's a good way to sneak it
>       through.

Q. Well, is this not typical of how emergency ordinances go through?

A. No, it's typical.

Q. Okay. But so could you just explain how is this, in effect -- how does this in effect help to slip the ordinance through?

A. Well, it hasn't been discussed in committee. It may have been discussed, and whatever reason, they just said here it is, and I'm sure McNeil knew about it because it's his committee and he wanted to change it, and -- but, you know, to the rest of us it wasn't a big deal.

Q. When you say his committee, McNeil was –

A Public affairs.

Q. Public affairs committee?

A. Yeah. Well, and you read earlier that he wanted to make the change. Dusty Rhodes said that, and that's how that happened.

Q. So to the extent that McNeil or anyone who wanted this change to be made, to the extent that they were involved with the committee or had influence on the committee, they –

A. Yeah.

Q. -- could effectuate the change?
A. Yeah.

Q. And the rest of the board really would not have much input or even knowledge of it?

A.    Didn't know, didn't care.

Motion, Exhibit 9, Deposition of Irv Smith, at 45-46.

Alderman Judy Yeager recalled that after the May 17, 2005, City Council meeting ended, McNeil was still talking and the City microphones were still on.  Yeager did not remember what McNeil said, but she recalled telling him: "You better be quiet because this is probably a lawsuit waiting to happen."  According to Yeager, Johnson was present and said, "I agree" when Yeager made her comment.[4]  Yeager Deposition, at 39.

The remaining Aldermen, however, stated that the selection of a particular contractor, such as a psychologist, was up to the Mayor.  The Mayor and his staff recommended the change, so they went along with the change.  Every Alderman except McNeil stated that Campion's personal views and political associations were not a factor in his or her decision to vote for the 2005 Ordinance.

After the 2005 Ordinance was passed, the City referred all applicants to Detrick for pre-employment psychological evaluations.  The City never

---

[4]Johnson states that this conversation happened at the end of a different meeting in which the Council was discussing a proposal to abolish psychological evaluations. Johnson Deposition, at 45.  For purposes of the Motion, the Court must assume Yeager's version of events is correct.

gave CBA or Campion thirty days written notice that the Contract was terminated.  The City, however, passed an additional ordinance to authorize payments of an additional $7,400.00 to CBA for services previously rendered.  <u>Motion</u>, Exhibit 21, <u>Ordinance 656-09-05, passed September 20, 2005</u>.

Campion and CBA then brought this action.  The Plaintiffs claim that the City discriminated and retaliated against them because Campion exercised his First Amendment rights of speech and association in connection with his affiliation with IFI.  <u>Complaint (d/e 1)</u>, Counts 1 and 2.[5]  The Plaintiffs also assert a breach of contract claim against the City. <u>Complaint</u>, Count 3.  The City now seeks summary judgment on these claims.

## ANALYSIS

At summary judgment, the City must present evidence that demonstrates the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to the Plaintiffs.  Any doubt

---

[5]The Complaint uses the terms "First Cause," "Second Cause," and "Third Cause." The Court refers to the Counts by number for simplicity.

as to the existence of a genuine issue for trial must be resolved against the City.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once the City has met its burden, the Plaintiffs must present evidence to show that issues of fact remain with respect to an issue essential to their case, and on which they will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The Plaintiffs' First Amendment speech and association claims in Counts 1 and 2 are both analyzed under a three-step analysis.  The Plaintiffs have the burden to present evidence that: (1) Campion engaged in protected activity under the First Amendment; and (2) the protected activity was a substantial or motivating factor in an adverse action taken by the City.  If the Plaintiffs meet their burden, then the City must present evidence that the same action would have been taken in the absence of the protected activity.  Spiegla v. Hull, 371 F.3d 928, 936 (7th Cir. 2004).

The Plaintiffs bring their § 1983 claims against the City rather than an individual City employee.  The City is liable under § 1983 only if the City is directly culpable for the action taken.  The City is only culpable for the discriminatory or retaliatory actions if the actions were taken pursuant

to official City policy, if the actions were taken as part of a custom or practice of the City, or if the actions were taken by the individuals who had ultimate policy making authority for the City.  Calusinski v. Kruger, 24 F.3d 931, 936 (7th Cir. 1994); see Auriemma v. Rice, 957 F.2d 397 (7th Cir. 1992).  The City policy makers are those who have the authority to adopt rules and conduct government, such as the Mayor and the members of the City Council.  Killinger v. Johnson, 389 F.3d 765, 771 (7th Cir. 2004); Auriemma, 957 F.2d at 399-401.  The identity of the persons with ultimate policy making authority is determined by local law.  Killinger, 389 F.3d at 771.

The City concedes that Campion's activities and association with IFI are protected activity under the First Amendment.  Plaintiffs, thus, must present evidence to demonstrate the second element -- that Campion's protected activity was a substantial or motivating factor in the City's decision to change psychologists, and so, terminate its relationship with Plaintiffs.  The Plaintiffs may meet this burden through either the direct or indirect method of proof.  Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003).  The Plaintiffs have elected to proceed under the direct method. Response, at 16, n. 4.  Under this method, the Plaintiffs must present

evidence at summary judgment, which if believed, would tend to prove the fact in question (i.e., that Campion's protected activity was a motivating factor) without reliance on inference or presumption.  Such evidence can be either a direct admission or circumstantial evidence.  Id.

This case concerns one decision by the City to change psychologists. Plaintiffs present no evidence of any policy, practice, or custom of the City to discriminate or retaliate against employees or contractors because of the person's protected activity with groups such as IFI.  The Plaintiffs, therefore, must present evidence that Campion's protected activity was a motivating factor for the individuals with final policy making authority.  In this case, the City Council had the final policy making authority.  Under local law, only the City Council could authorize the agreement to switch psychologists from Plaintiffs to Detrick.  65 ILCS 5/8-1-7(a); Springfield Municipal Code §§ 31.05, 31.11, & 38.44.

The face of the 2005 Ordinance does not show any discriminatory or retaliatory motivation.  The Plaintiffs, therefore, must produce other evidence to show that Campion's protected activity was a motivating factor for a significant bloc of the members of the Council, and the probable complicity of the remaining members of the Council who supported the

decision.  Butt v. Board of Trustees of Eastern Illinois University, 83 F.Supp.2d 962, 974 (C.D. Ill. 1999); Scott-Harris v. City of Fall River, 134 F.3d 427, 438 (1st Cir. 1997), *rev'd on other grounds sub nom*, Bogan v. Scott-Harris, 523 U.S. 44, 118 (1998).

The Plaintiffs have direct evidence that Alderman McNeil was motivated by Campion's protected activity.  He admitted that he told Davlin to get rid of Campion because of his views and his association with IFI.  Alderman Edwards also complained about Campion, but his complaints related to the consistency of Campion's reports and the value of psychological evaluations in general.  Edwards' criticisms were not related to Campion's protected activity.

No other competent evidence indicates that Campion's protected activity was a motivating factor for a significant bloc of the Council. Bartolomucci opined that the Column created a political problem for the administration, and the administration did something about it. Bartolomucci does not explain the factual basis of his opinion.  No evidence submitted indicates whether Bartolomucci had personal knowledge of the motivation of any other Alderman in voting for the 2005 Ordinance.  As such, his opinion is little more than speculation and is not competent to

support a motion for summary judgment.  Fed. R. Civ. P. 56(e).  Alderman

Smith also opined that the Council went along with McNeil because they

did not care who the City hired to be its psychologist.  Like Bartolomucci,

his opinions about the motives of the other members of the Council are no

more than speculation.  Edwards speculated that Davlin was responding to

the criticism from himself and McNeil, but, again he did not have any

personal knowledge to support his opinion.   These opinions are not

competent evidence at summary judgment.

Aldermen Smith and Bartolomucci arguably may have been complicit

in McNeil's desire to get rid of Campion because of his protected activity.

Smith indicated that he did not care about the matter, and so, went along

with McNeil's desire to get rid of Campion.  Bartolomucci interpreted the

2005 Ordinance as a political decision to get rid of Campion because of his

protected activity, and he decided to go along with the decision.  Even so,

three Aldermen, McNeil, Smith, and Bartolomucci, did not constitute a

significant bloc of the City Council when eight votes were needed to pass

the 2005 Ordinance.  See e.g., Scott-Harris, 134 F.3d at 439-40 (two city

council members out of six was not a significant bloc).  The other Aldermen

and Mayor Davlin all stated that Campion's protected activity was not a

motivating factor.  No competent evidence contradicts this.  Plaintiffs have failed to present evidence that Campion's protected activity was a motivating factor for the City Council's decision to change psychologists and effectively terminate the City's relationship with the Plaintiffs.

Plaintiffs argue that the City administration made the decision to change psychologists, not the City Council.  Administration officials participated in the decision, but the Plaintiffs sued the City under § 1983.  Based on the facts in this case, the City can only be liable under § 1983 for the actions taken by the individuals with final policy making authority for the City.  Killinger, 389 F.3d at 771.  The City Council had the final policy making authority.  Thus, the City Council's motivations are the issue.  The thoughts or desires of administration officials are not sufficient to establish liability.

Even if City administration officials had final policy making authority, there is no evidence that Campion's protected activity was a motivating factor for the decision to change psychologists.  The Column was published in August 2004.  McNeil then made his statement to Davlin after reading the Column.  This statement is the only evidence that any City official with any policy making authority was motivated by Campion's protected

activity.[6]  Davlin did not recall the statement.  His administration took no action at that time.  In fact, the City renewed the Contract in December 2004, four months after McNeil said to get rid of Campion.  The change in psychologists did not happen until the following May.  There simply is no evidence of a connection between McNeil's comment and the Davlin administration's decision to propose a change in psychologists.

The Plaintiffs also argue that the City did not ask for summary judgment on the Plaintiffs' First Amendment free speech claim.  Response, at 15, n.2.  The Court disagrees.  The Plaintiffs asked for summary judgment on all claims.  The Plaintiffs note that the City's Motion does not discuss additional elements of free speech analysis regarding the nature and content of the speech.  Id.  The additional elements of free speech analysis concern whether the speech is protected activity.  Spiegla, 371 F.3d at 935-36.  The City conceded that Campion engaged in protected activity; thus, the City did not need to address these additional elements.

The Plaintiffs failed to present evidence that Campion's protected

---

[6]The only other person who expressed any concerns about Campion's protected activity was Davis.  Davis Deposition, at 25-26.  She was an assistant to Larry Selinger.  There is no evidence that she had any policy making authority at all.  Her motives clearly cannot be imputed to the City for purposes of § 1983 liability.

activity was a motivating factor for the City Council's decision to switch psychologists. The City is entitled to summary judgment on the Plaintiffs' First Amendment claims in Counts 1 and 2. The Court declines to exercise supplemental jurisdiction over the breach of contract claim in Count 3, and so, dismisses that claim for lack of jurisdiction.

THEREFORE, the City of Springfield's Motion for Summary Judgment (d/e 54) is ALLOWED. Summary judgment is entered in favor of the City of Springfield and against Plaintiffs Campion, Barrow & Associates, Inc., and Michael A. Campion on the Plaintiffs' First Amendment claims as alleged in Counts 1 and 2 of the Complaint. The breach of contract claim, as alleged in Count 3, is dismissed for lack of jurisdiction. All pending motions are denied as moot. This case is closed. IT IS THEREFORE SO ORDERED.

ENTER:  March 18, 2008

FOR THE COURT:

s/  Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE